FILED
2013 Sep-30  AM 10:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **REBECCA A. FULTON,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 12-KOB-0336-M** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

## I.  INTRODUCTION

On May 5, 2008, the claimant, Rebecca A. Fulton, applied for disability insurance benefits under Title II of the Social Security Act and supplemental security income under Title XVI of the Social Security Act. (R. 82-84).  The claimant alleges disability commencing on June 9, 2005 because of polyarticular migratory arthritis, depression, and pain.  (R. 37).  The Commissioner denied the claims both initially and on reconsideration.  (R. 50, 53).  The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on March 18, 2009.  (R. 58)  In a decision dated September 28, 2009, the ALJ found that the claimant was not disabled as defined by the Social Security Act and, thus, ineligible for disability insurance benefits or supplemental security income.  (R. 37).  On November 29, 2011, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration.  (R. 4-6).

The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  For the reasons stated below, this court affirms the decision of the Commissioner.

## II.  ISSUE PRESENTED

The claimant presents two issues for review:  (1) whether the ALJ gave proper weight to the opinion of the claimant's treating physician, Dr. Cunningham; and (2) whether the ALJ properly evaluated the opinion of Dr. Nichols, the state's consulting psychologist.

## III.  STANDARD OF REVIEW

The standard of reviewing the Commissioner's decision is limited.  This court must affirm the Commissioner's decision if he applied the correct legal standards and if substantial evidence supports his factual conclusions.  *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No…presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims."  *Walker*, 826 F.2d at 999.  This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court may "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings."  *Walker*, 826 F.2d at 999.  A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the

record in its entirely and take into account any evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expect to last for a continuous period of not less than 12 months." 42 U.S.C § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal on the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

The ALJ must state with particularity the weight given different medical opinions, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). The Commissioner may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F. 2d 834, 835 (11th Cir. 1985).

The ALJ must give the opinion of treating physicians substantial weight, and may only credit the opinion of a consultative physician above that of a treating physician for good cause.

*Crawford v. Commissioner*, 363 F.3d 1155, 1159 (11th Cir. 2004); *see also Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). "Good cause" for rejecting a treating physician's testimony may include occasions when such evidence is wholly conclusory, unaccompanied by objective medical evidence, or contradicted by other medical evidence. *Crawford*, 363 F.3d at 1159; *Jones v. Dept. of Health & Human Services*, 941 F.2d 1529, 1533 (11th Cir. 1991); *see also Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991).

## V. FACTS

The claimant has a G.E.D. and was 47 years old at the time of the administrative hearing. (R. 29, 363). Her past work experience includes employment as a house cleaner, a grocery store cashier, and a fast food worker. The claimant alleges she is unable to work because she cannot use her hands and has pain in every joint in her body. She further claims that she suffers from depression, anxiety, and episodic panic attacks. (R. 29-30).

### *Physical and Mental Limitations*

The claimant sought treatment with Dr. Barry McCleney at Christian Medical Clinics on April 28, 2005, complaining of pain in her left shoulder and chest. A week later, on May 6, 2005, she returned to Dr. McCleney claiming that the pain had moved into her chest. Dr. McCleney diagnosed the claimant with polyarthritis of multiple sites and prescribed Medrol. (R. 139-140).

On March 16, 2006, Dr. Jennie Wheeler examined the claimant at Montclair Baptist Medical Center. The claimant presented with migratory joint pain in her shoulders, elbows, hands, and hips. Dr. Wheeler noted that although the claimant's symptoms were consistent with a diagnosis for fibromyalgia, they did not meet the diagnostic criteria. She found that the

4

claimant did have mildly reduced range of motion in her left shoulder, but that her joints otherwise had no erythema or edema.  Dr. Wheeler explained to the claimant that inflammation was causing her joint pain; she prescribed Naprosyn to control the inflammation and instructed the claimant to take it even when pain free.  Dr. Wheeler also prescribed 30 mg of Cymbalta to manage the claimant's depression and pain and gave her exercises to do that he claimed would be more effective than medication in alleviating her arthritis symptoms.  Extensive workups, including a sedimentation rate, antinuclear antibody test, rheumatoid factor, and rheumatologic studies, were all negative.  (R. 209-211).

The claimant sought treatment at St. Vincent's East Emergency Department on May 2, 2006, complaining of mild tenderness in her lower left quadrant and moderate back pain.  Dr. Chris Sexton, the attending physician ordered  three x-rays of her lumbosacral spine that showed "hypertrophic spurring of the lower lumbar spine with no acute fracture or dislocation."  CT scans of her abdomen and pelvis with contrast showed no abnormalities.  Dr. Sexton prescribed Toradol for inflammation and Norlfex to relieve pain.  (R. 155-163).

On August 1, 2006, Dr. Steven Presley treated the claimant at Trinity Medical Center. The claimant stated she had continued joint pain, and Dr. Presley noted that her hands did appear to be "somewhat swollen and shiny in appearance."  He also reported that the claimant was tender to palpation at her PIP joints.  He diagnosed the claimant with persistent arthralgias, depression, and fatigue, but noted the claimant's improvement on Cymbalta.  (R. 205-207).

The claimant sought treatment again at Trinity Medical Center on October 9, 2006, with Dr. Will Cunningham.  The claimant indicated that she continued to experience joint pain and fatigue, particularly in her bilateral hands at the PIP joints.  X-rays taken of her hands were

normal, but Dr. Cunningham did note tenderness in the PIP joints in both hands. Dr. Cunningham stated that her complaints "are certainly concerning for rheumatoid arthritis, though her sedimentation rate has been normal and an antinuclear antibody had been negative." (R. 195). The claimant reported that the Naprosyn did not improve her joint pain, but that the Cymbalta improved her fatigue. Dr. Cunningham increased the claimant's Cymblata dosage from 30 mg to 60 mg and gave her samples of Celebrex at 200 mg to take once daily for pain with instructions to return in one month. (R. 195-203).

The claimant returned to Trinity Medical Center on November 6, 2006, reporting dizziness, tongue swelling, and a rash while taking Celebrex and was ordered to stop taking it. (R. 191).

On November 14, 2006, the claimant returned for a follow-up exam at Trinity Medical Center. Dr. Presley, the attending physician, noted that the claimant had no edema in her extremities but did have some shininess in her fingers bilaterally. Dr. Presley diagnosed her with migratory arthritis and indicated that she should continue taking Naprosyn and Cymbalta. He also planned to refer her to Dr. Maura Kennedy, a rheumatologist.

Dr. Maura Kennedy examined the claimant on December 19, 2006 on Dr. Presley's referral. Dr. Kennedy observed that the claimant had no synovitis in her joints and no edema in her extremities. She did note some tenderness over the flexor tendons of the hands, but no nodularity or triggering; minimal tenderness over the medial epicondyles; and unremarkable findings in her feet and ankles. Dr. Kennedy found "no evidence clinically to suggest rheumatoid arthritis or systematic lupus," and diagnosed the patient as having a two-year history of migratory arthritis. She recommended that the claimant take Feldene. (R. 310).

6

On February 28, 2008, at the Trinity Medical Center, Dr. Cunningham examined the claimant, who complained of joint pain, anxiety, and panic attacks.  Dr. Cunningham noted that the claimant stated that because she had no diagnosis from Dr. Kennedy in December 2006, she decided to stop seeking treatment from a doctor.  Dr. Cunningham conducted a 10-point review of her systems with negative results; observed no abnormalities in her extremities; and noted no active synovitis of her joints.  The claimant rated her pain as a 4 out of 10.  (R. 326).  Because the claimant had run out of medication, Dr. Cunningham restarted the claimant on Cymbalta for her depression and Feldene for her migratory arthritis.  (R. 178-181).

On April 17, 2008, Dr. Cunningham again examined the claimant, who reported to him that her arthritis and panic attacks had neither improved nor worsened.  The claimant indicated that her pain level was a 6 out of 10. (R. 326).  Although she stated her depression also had not improved, Dr. Cunningham noted that she was "much, much better."  Dr. Cunningham increased her prescription for Cymbalta from 30 to 60 milligrams and ordered her to continue taking Feldene.  Dr. Cunningham instructed the claimant to discontinue taking Klonopin[1] because it was activating her symptoms and keeping her up at night.  (R. 172-175).

On June 12, 2008, Dr. Cunningham again examined the claimant, who reported no new problems or complaints.  The claimant reported that "she has had no further problems and is doing well on her current medications."  She rated her pain level as a 5 out of 10.  (R. 326).  Dr. Cunningham recommended that she continue on Cymbalta and Feldene for her anxiety, depression, and arthritis.  (R. 169-171).

---

[1]  The court is unclear from the record as to who initially prescribed Klonopin or how long the claimant had been taking it.

Dr. Mina Khan conducted a consultative physical examination of the claimant on July 3, 2008 at the request of the Disability Determination Service.  Dr. Khan noted that the claimant was alert and oriented to person, place, and time; that her motor and sensory exam was intact in both her upper and lower extremities; that her deep tendon reflexes at the biceps, triceps, knee and ankle were normal, except in the left knee where reflexes were absent; that she had no lateralizing neurological findings; that her gait was normal without the use of assistive devices; that Romberg's sign was normal; and that her fine and gross manipulation were normal.  Further, Dr. Khan noted no tenderness to palpitation over the spine and a normal range of motion of the lumbar spine.  Dr. Khan diagnosed the claimant with generalized arthralgias with no specific diagnosis, although she did remark that "rheumatoid arthritis may be a possibility"; chronic fatigue; and depression with suicide attempts.  The claimant told Dr. Khan that she became suicidal "while on therapy for depression," but "resolved [the issue] after discontinuing the medication she had been on."  (R. 215-218).

At the request of the Disability Determination Service, Dr. June Nichols, a clinical psychologist, conducted a consultative psychological exam on the claimant on July 8, 2008. Dr. Nichols diagnosed the claimant with "Major Depressive Disorder, Recurrent, Severe without Psychotic Features" and assessed a GAF score of 55, indicating moderate limitations in mental functioning.  Dr. Nichols reported that the claimant's symptoms are severe; that her present symptomology severely compromises her ability to relate interpersonally and withstand everyday work pressures; that she has no deficits in ability to remember, understand, and carry out simple instructions; that she can live independently and handle her own money; and that her prognosis over the next 12 months is poor.   (R. 220-223).

On July 31, 2008, Dr. Erin Coleman, a colleague of Dr. Cunningham at Trinity Medical Center, examined the claimant, and indicated that she discussed her findings with Dr. Cunningham.  Dr. Coleman noted that, after a full rheumatologic workup, doctors ruled out any autoimmune or rheumatologic diseases.  Dr. Coleman also noted that symptomatic-wise, the claimant did not appear to have the clinical spectrum for fibromyalgia.  Also, because of the claimant's diagnosis of major depression disorder, Dr. Coleman considered some of the claimant's physical pain to be secondary to her major depression.  Aside from nonspecific migratory polyarthralgias, Dr. Coleman noted that the claimant had no other medical issues.  The claimant reported her pain level as a 4 out of 10.  (R. 326).  Finally, Dr. Coleman recommended the claimant continue on Cymbalta and engage in aerobic exercise.  (R. 269-270).

At the Disability Determination Service's request, Gloria Roque, Ph. D., a psychological consultant, completed a psychiatric review technique and a mental residual functional assessment based on her examination of the claimant's medical file.  In the psychiatric review technique, Dr. Rogue found that the claimant had moderate limitations in her activities of daily living; in maintaining social functioning; and in maintaining concentration, persistence, and pace.  Dr. Rogue noted that the claimant had no episodes of decompensation for an extended duration. As such, Dr. Roque found that the claimant did not qualify for a listing under 12.04 or 12.06.  (R. 228-241).

In her mental RFC assessment, Dr. Rogue found that the claimant was not significantly limited in any category involving her understanding and memory.  In the sustained concentration and persistence category, Dr. Roque found that the claimant was not significantly limited in her ability to carry our short and simple instructions; ability to carry out detailed instructions; ability

9

to perform activities within a schedule, maintain regular attendance, and be punctual; ability to sustain an ordinary routine without special instruction; ability to work with others without being distracted; and ability to make simple work-related decisions. However, Dr. Roque did find the claimant moderately limited in her ability to maintain attention and concentration for extended periods and in her ability to complete a normal work day and work week without interruptions and rests. (R. 224-226).

Regarding her social interaction, Dr. Roque opined that the claimant was not significantly limited in her ability to ask simple questions or request assistance; to get along with coworkers or peers; and to maintain socially appropriate behavior.  She did find the claimant had moderate limitations in her ability to interact appropriately with the general public and to accept instructions from supervisors. (R. 225).

Dr. Roque, in assessing the claimant's adaptation skills, found that the claimant was not significantly limited in her awareness of normal hazards and responses to them; her ability to travel and use public transportation; and her ability to set realistic goals and make plans independently.  However, Dr. Roque did opine that the claimant had moderate limitations in her ability to respond appropriately to changes in the work setting. (R. 225).

In summarizing her findings, Dr. Roque found that the claimant could carry out instructions; could sustain attention to simple tasks for extended periods; could tolerate ordinary work pressures; should avoid excessive workloads, quick decision making, rapid changes, and multiple demands; would benefit from regular rest breaks and a slowed pace; should have only casual, limited contact with the general public; should receive supportive feedback; and could adapt to infrequent, well-explained changes.  (R. 226).

10

Further, based on her review of the file, Dr. Roque found that the claimant's allegation were only partially credible. Dr. Roque particularly noted her claim that her depression was unimproved by medication, when Dr. Cunningham had noted significant improvement between April and June of 2008. Dr. Roque considered but disagreed with Dr. Nichol's assessment that the claimant would likely not improve over the next 12 months. Dr. Roque noted that because the file lacked evidence of a longitudinal history of severe depression, the claimant would likely continue to improve over the next 12 months. (R. 240).

On August 12, 2008, Dr. Robert H. Heilpern, a state agency medical consultant, reviewed the claimant's file and completed a physical RFC assessment. Dr. Heilpern listed the claimant's diagnoses as degenerative disc disease of the lumbar spine and migratory arthritis. Dr. Heilpern assessed the claimant as retaining the RFC to perform medium work with the following limitations: can occasionally lift or carry up to 50 pounds; can frequently lift or carry up to 25 pounds; can stand or walk for a total of six hours in an eight hour work day; can sit with normal breaks for about 6 hours in an 8-hour workday; has unlimited ability to push or pull; can frequently climb ramps and stairs but only occasionally climb ladders, ropes or scaffolds; can frequently balance, stoop, kneel, crouch, and crawl; and must avoid hazard machinery. Dr. Heilpern noted that the claimant had no manipulative, visual, or communicative limitations. Finally, Dr. Heilpern concluded that the claimant was only partially credible in her allegations regarding her symptoms but did not explain his conclusion. (R. 256-264).

Dr. Cunningham again examined the claimant on September 2, 2008. He noted that the claimant had nonspecific migratory polyarthralgias, with no specific diagnosis, with a large part of her problem being in her bilateral hands. Dr. Cunningham also noted, however, no erythema,

11

ulnar deviation, or joint deformity in either hand.  The claimant indicated a pain level of 5 out of 10.  (R. 326).  The claimant reported that soaking her hands in hot water relieves the pain, so Dr. Cunningham referred the claimant to physical therapy for a paraffin wax treatment.  He also prescribed Ativan for her continued anxiety. (R. 268).

On October 7, 2008, Dr. Cunningham wrote a letter "To Whom It May Concern," stating that the claimant has "nonspecific migratory polyarthralgias with a large part of her problem being in her bilateral hands."  Dr. Cunningham indicated that the claimant would be unable to work for six months to a year.  (R. 349-350).

On October 27, 2008, Dr. David Spalding, with UAB's Immunology & Rheumatology Clinic, examined the claimant.  He found no evidence of rheumatoid arthritis or any other systematic inflammatory arthropathy.  He did, however, determine that she had bilateral bicipital tendonitis that he believed was causing her pain and swelling, along with a mild reflex sympathetic dystrophy-like process in the hands.  The only other local pathology the doctor observed was mild carpal tunnel.  Finally, Dr. Spalding observed unrelated, milder iliotibial band tendonitis in the legs that he also believed was causing some of the pain in the claimant's feet.  As treatment for the tendonitis, Dr. Spalding injected both the right and lift bicipal tendon sheaths with Depo-Medrol 60 mg plus Xylocaine and Marcaine.  As follow up, he recommended an at home regimen including heat and cold packs and stretches.  (R. 333-335).

On January 10, 2009, the claimant sought treatment at the Emergency Room at St. Vincent's East for back pain resulting from lifting, turning, and bending while mopping the floor in her home.  (R. 340-348). The claimant rated her pain as a 9 out of 10, but the attending physician noted no acute distress in her general appearance.  The attending physican injected the

12

claimant with 60 mg of Toradol and 60 mg of Norflex and prescribed her 5 mg of Lortab. At the time of discharge, the claimant felt better. (R. 342-345).

On February 5, 2009, the claimant returned to Trinity Medical Center complaining of a pain level of 5 out of 10. (R. 326). Dr. Cunningham noted her chronic unspecified polyarticular migratory arthritis, and recommended that she continue paraffin wax treatments; continue to take Cymbalta to control her depression; and begin therapy with a Cox 2 inhibitor for her pain. Dr. Cunningham also recommended that because she had tolerated Ativan well, the claimant should continue taking it for her anxiety. (R. 329-330).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insurance benefits and supplemental security income, the claimant requested and received a hearing on March 18, 2009 before an ALJ. (R. 58-63).

The claimant testified that she was 46 years old, attended school through the eighth grade, and later obtained her GED. She stated that her past work includes work as a cashier and as a housekeeper, but that she has not worked since June 9, 2005. (R. 362-364). She stated that she quit her last job in 2005 when her boss got angry with her because she had to miss work to go to the doctor. (R. 371).

She stated that she does have a driver's license, but that she has not driven in about a year because she had vertigo that comes and goes that makes it dangerous to drive. The claimant testified that her sister drove her to the hearing. (R. 372-373).

As to what problems have kept her from working, the claimant testified that she has severe joint pain in her knees, feet, back, hips, hands, and toes. In explaining how she cannot use

her hands, the claimant stated that her whole hands are swollen in the mornings and have hurt

"real bad" for the past four years; that she cannot peel potatoes or open jars; that she can turn a

door knob; that she can use a pen but not write a letter; and that she cannot pick up a gallon of

milk. She testified that the pain in her hands is like a toothache that never goes away.  (R. 365-

366, 374).

         To temporarily relieve the pain in her hands, the claimant stated that she puts them in hot

water or a hot wax machine.  She indicated that any type of activity aggravates the pain in hands

and joints, but that the pain in parts of her body, like her knees and hips, can come on for a

couple of hours or months, and then go away completely for a period of time.  (R. 374-76).

         Regarding her postural maneuver limitations, the claimant testified that she can stand 15

minutes before she has to sit down because her "legs feel like they're giving away"; she can sit

15 minutes before her hips and back begin to hurt; she can walk a half a block; and she can bend

over but hurts coming back up.  (R. 366-367).

         The claimant stated that she suffered from severe fatigue for the past three years and

wakes up feeling tired. She testified that she lies down at least half of a day. (R. 368, 377).  She

testified that she sometimes sleeps at night "very hard and for long periods of time," but

sometimes wakes up at night sweating, with chills and jerking episodes that she attributes to her

anxiety.  She stated that Ativan helps stop the jerking.  (R. 369).

         She also indicated that when she has panic attacks, they last about 15-30 minutes; her

heart beats really fast; and she cannot catch her breath.  She testified that her panic attacks

sometimes occur if more than five people are in a room with her; if she is at the mall where she

cannot see the door to leave; or if she gets upset about something.  (R. 370, 380)

14

When asked about her depression, the claimant stated that her doctor says she hurts all the time because she is depressed. She indicated that the Cymbalta helps her depression somewhat but does not help the pain in her joints; that she does not think much of killing herself anymore; that her depression makes her sleepy; and that she does not want to be around anybody. (R. 368-369).

The claimant stated that she does not do chores around the house because she just does not care about doing them. (R. 370). She testified that she smokes a pack of cigarettes every two to two and a half days, but that she is trying to quit. (R. 377).

She testified that, on a typical day, she normally wakes up about 9:00 or 9:30 AM and takes care of her personal hygiene; goes to the kitchen for coffee; goes to the couch; and lies on the couch all day watching television, sleeping, or reading her Bible. (R. 379-380).

The claimant stated that Dr. Cunningham has treated her for depression, joint pain, and anxiety on and off for about three years. (R. 379). She testified that her pain level is a 7 out of 10. (R. 381).

The ALJ then questioned Dr. Julia Russell, a vocational expert, regarding the claimant's past relevant work. Dr. Russell stated that the claimant's past relevant work includes working as a housekeeper, classified as light and unskilled; a cashier in a grocery setting, classified as light, low, and semi-skilled; and a fast food worker, classified as light and unskilled. (R. 383).

The ALJ then posed a hypothetical to Dr. Russell for an individual with a GED who can perform medium work with the following limitations: must work in a temperature controlled environment; can perform simple, repetitive, and non-complex tasks; cannot push or pull with the upper or lower extremities; can occasionally bend and stoop; and can never climb or drive.

15

Dr. Russell testified that no jobs at the medium exertion level exists for an individual with those limitations because medium level work requires postural movements in excess of occasional. (R. 382-383).

The ALJ next asked Dr. Russell to consider if the individual could perform any light work given the above hypothetical. Dr. Russell testified that such an individual could perform unskilled, light work as an assembler, with 4,000 - 4,600 jobs available in Alabama; a sorter, with more than 9,000 such jobs in Alabama; a machine tender, with at least 3,000 jobs existing in Alabama. (R. 384).

Given the same hypothetical, the ALJ asked Dr. Russell if any sedentary jobs existed that such an individual could perform. Dr. Russell stated that the individual could work at unskilled, sedentary jobs such as assemblers, with more than 5,000 available in Alabama; testers, sorters, and samplers, with over 8,500 jobs available; and automatic machine tenders, with 750 to 1000 jobs existing in Alabama. (R. 384). Dr. Russell testified that she believed that the claimant could work at all the jobs she described in the light and sedentary categories.

The ALJ next asked Dr. Russell if the claimant could perform any of her past relevant work. Dr. Russell opined that the claimant could return to her job as a fast food worker and cashier checker, but could not perform the cleaner job. (R. 384-385).

Adding the additional limitation of needing to sit and/or stand at her option, the ALJ asked Dr. Russell if the claimant could still perform her past relevant work. Dr. Russell responded that none of the claimant's past relevant work would allow for a sit/stand option. However, Dr. Russell testified that both the light jobs and sedentary jobs she discussed would allow for a sit/stand option. Dr. Russell also testified that all the light and sedentary jobs that she

16

listed could be performed by an individual with an above-average, average, borderline, or low average IQ. (R. 385).

The ALJ then added an additional limitation of only using both hands for occasional fine fingering or handling and asked if any jobs existed for such an individual. Dr. Russell testified that such a limitation would preclude all of the claimant's past relevant jobs and all sedentary and light exertional jobs previously listed. (R. 386).

The ALJ asked Dr. Russell to include only the additional limitation of occasional gross manipulation with both hands, and not the fine fingering. Dr. Russell stated that this limitation also would preclude all past relevant work and all sedentary and light jobs she previously discussed. (R. 387).

Regarding social interaction, the ALJ asked Dr. Russell if any of the jobs she listed included working around people. Dr. Russell indicated that the light and sedentary jobs she listed previously involved working with things as opposed to people and do not require interaction with co-workers, although some may be present on the work site.

Dr. Russell also stated that the jobs she listed at both levels would not permit an employee to generally lie down during a regularly scheduled work day and would require that absenteeism not exceed two days per month. (R. 388-389).

Dr. Russell testified that a level of pain rated at a 7 out of 10 constitutes moderately severe pain, and that anything greater than an 8 out of 10 would be severe. She testified that a pain level assessed at moderately severe to severe would generally preclude work activity. (R. 387).

*The ALJ 's Decision*

On September 28, 2009, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act.  The ALJ found that the claimant had not engaged in substantial gainful activity since the alleged onset of her disability and that she was insured for disability on her alleged onset date through September 30, 2005.  (R. 41).

The ALJ found that the claimant's unspecified polyarticular migratory arthritis, depression, and anxiety qualified as severe impairments.  In assessing the claimant's mental impairments, the ALJ stated that, when considered in combination, her mental impairments impose a moderate restriction on her daily activities; a moderate limitation on her ability to maintain social functioning; and a moderate limitation on her ability to maintain concentration, persistence, or pace.  He also noted that the record contained no episodes of decompensation.  He concluded, however, that the claimant's impairments, when considered individually or in combination, do not meet or equal a listing. (R. 37, 42).

The ALJ then considered whether, in spite of her impairments, the claimant has the residual functional capacity to perform her past relevant work.  In assessing her RFC, the ALJ applied the pain standard to the claimant's subjective allegations of pain and other symptoms. The ALJ stated that the medical evidence in the record does establish underlying impairments that could produce some pain and limitations; however, he concluded that substantial evidence does not support a conclusion that the impairments are of such a severity to give rise to the disabling pain and limitations that the claimant alleges.  (R. 37-38).

The ALJ noted the claimant's history of migratory arthritis affecting her back, knees, and hands. He noted x-rays of the claimant's back from May 2006 revealing hypertrophic spurring

18

but no fracture or dislocation; a negative Romberg sign in July 2008; no evidence of abnormalities in her knees, ankles, or feet during Dr. Kennedy's exam in December 2006; and a normal gait in July 2008 in Dr. Kahn's examination.  (R. 38).

The ALJ also pointed out that x-rays of the claimant's hands on October 9, 2006 were normal; that despite some tenderness in her hands in December 2006, the exam showed no abnormalities; that in February 2008, an examination showed no synovitis or joint inflammation; that Dr. Cunningham indicated that his exam on February 28, 2008 was unremarkable; that although the claimant reported an increase in her pain level in April 2008, Dr. Cunningham still deemed the overall examination unremarkable; and that the claimant had normal range of motion in her upper and lower extremities in July 2008.  Regarding the claimant's joint pain, the ALJ noted that although she had some mild swelling around the small joints in her hands, Dr. Kahn found no signs of active synovitis and normal fine and gross manipulation bilaterally in July 2008. (R. 38-39).

In assessing Dr. Spalding's findings from October 2008, the ALJ noted the diagnosis of bilateral tendonitis that caused "some pain with a mild reflex sympathtic dystrophy-like process" in her hands.  But, the ALJ also noted that Dr. Spalding found no evidence of rheumatoid arthritis or any other "systemic inflammatory arthropathy" of significance except mild carpel tunnel.  (R. 39).

The ALJ specifically noted the claimant's own admissions regarding her pain levels as evidence of her mild to moderate.  He noted that she reported a pain level of 4 out of 10 on February 28, 2008; a 4 out of 10 on July 31, 2008; and a 5 out of 10 in February 2009.  (R. 38-39).

Regarding her depression, fatigue, and anxiety, the ALJ noted that the claimant reported that Cymbalta improved her fatigue; that Dr. Cunningham increased her Cymbalta dosage from 30 to 60 mg per day in June 2008; that Dr. Cunningham had to restart the claimant's prescriptions for Feldene and Cymbalta because she had "ran out of her medications"; that the claimant discontinued taking Klonopin in April 2008; and that Dr. Cunningham reported no side effects from the Cymbalta in July 2008. (R. 39).

In discussing Dr. Nichols' opinion, the ALJ noted that Dr. Nichols assessed the claimant as severely limited in her ability to relate interpersonally and withstand the pressures of work. The ALJ also pointed out that Dr. Nichols assessed the claimant's GAF at 55, "indicative of only moderate difficulties in social and occupational functioning" and that Dr. Nichols indicated that the claimant had no difficulties understanding, remembering, or carrying out simple work-related instructions.  (R. 39).

The ALJ noted in detail and gave substantial weight to Dr. Roque's mental assessment that the claimant had primarily moderate work-related limitations.  Additionally, the ALJ pointed out the claimant's admissions that her depression had improved in February 2009 and that Ativan improved her anxiety.  (R. 34-35, 39).

The ALJ discussed Dr. Cunningham's letter "To Whom It May Concern" dated October 7, 2008, indicating that the claimant was unable to work.  The ALJ acknowledge that as a treating physician, Dr. Cunningham's opinion is entitled to substantial weight. However, the ALJ found Dr. Cunningham's opinion conclusory and indicated that medical doctors are not qualified to make vocational considerations beyond their medical expertise.  The ALJ also noted that each time that Dr. Cunningham treated the claimant, she reported her pain level anywhere between a 4

20

and 6 out of 10.  In discrediting Dr. Cunningham's conclusion, the ALJ pointed out Dr. Cunningham's unremarkable findings during his examinations of the claimant and her reports to him that she had improved in April 2008.  (R. 40).

After stating that he considered the entire record, including the claimant's testimony, the ALJ concluded that the claimant has the residual functional capacity to perform sedentary work with the following limitations: must work in a temperature controlled environment; must have a sit or stand option; can perform only simple, repetitive, non-complex tasks; cannot push or pull with her upper or lower extremities cannot climb or drive; can occasionally bend or stoop; and must work primarily with things and not people.  The ALJ found that, if the claimant works within these limitations, her mental impairments will "impose no greater than a mild to moderate functional restriction upon her ability to engage in basic work activities."  (R. 40).

In reaching his RFC determination, the ALJ afforded substantial weight to the non-examining agency assessments because they were largely consistent with the objective, clinical reports from examining doctors.  The ALJ gave Dr. Heilpen's finding that the claimant could perform limited medium work minimal weight.  (R. 40).

The ALJ found that, given a RFC to perform sedentary work with limitations, the claimant could not perform her past relevant work.  However, noting the vocational expert Dr. Russell's testimony regarding the unskilled, sedentary jobs the claimant could perform, the ALJ found that the claimant could work as an assembler; a tester, sorter, or sampler; or an automatic machine tender.  The ALJ also indicated that all three of these unskilled, sedentary jobs exist in significant numbers in the national economy.  (R. 41).

21

The ALJ determined that the claimant was not disabled under the Social Security Act at any time through the date of his decision.

## VI. DISCUSSION

1. *The ALJ gave proper weight to the treating physican Dr. Cunningham's opinion.*

The claimant argues that ALJ erred by failing to give proper weight to Dr. Cunningham's opinion letter that the claimant could not work for six months to a year. The court disagrees and finds that the ALJ properly discredited Dr. Cunningham's conclusory opinion.

The ALJ must give the testimony of a treating physician substantial or considerable weight unless he shows "good cause" to the contrary. *Crawford v. Commissioner*, 363 F.3d 1155, 1159 (11th Cir. 2004); *see also Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). However, the ALJ may discount a treating physician's report when it is not accompanied by objective medical evidence, is wholly conclusory, or is contradicted by other medical evidence in the record. *Crawford*, 363 F.3d at 1159. Where the ALJ articulates specific reasons for failing to give the opinion of a treating physician controlling weight and those reasons are supported by substantial evidence, he commits no reversible error. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).

In this case, the ALJ articulated specific reasons for discrediting Dr. Cunningham's letter addressed "To Whom It May Concern" of October 7, 2008. The ALJ indicated that Dr. Cunningham's letter stated a conclusion regarding the claimant's inability to work and that such a conclusion was beyond his medical expertise and within the province of the ALJ to make. Moreover, the ALJ articulated that the claimant's own admissions to Dr. Cunningham regarding her pain levels conflicted with Dr. Cunningham's conclusion. The ALJ pointed to the claimant's

reports to Dr. Cunningham that her pain levels were only between a 4 and 6 out of 10 when Dr.

Cunningham examined her on February 28, 2008, July 31, 2008, and February 5, 2009.  In

addition, the ALJ noted Dr. Cunningham's unremarkable objective medical findings during his

examinations of the claimant and in the record as a whole.  Moreover, the ALJ articulated that

Dr. Cunningham's conclusion conflicted with the claimant's reports to him that she had

improved in April 2008.

This court finds that the ALJ stated good cause to discount Dr. Cunningham's conclusion

regarding the ability of the claimant to work. The court also finds that the ALJ articulated

specific reasons for discrediting Dr. Cunningham's opinion and that substantial evidence

supports the ALJ's reasons for doing so.

2.  *The ALJ properly evaluated Dr. Nichols's opinion.*

The claimant argues that the ALJ improperly evaluated Dr. Nichol's opinion regarding

the claimant's inability to relate interpersonally and withstand pressures of work. The court finds

that the ALJ properly evaluated Dr. Nichol's opinion and that substantial evidence supports the

ALJ's findings.

The ALJ must state with particularity the weight given different medical opinions, and

the failure to do so is reversible error.  *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987);

*see also MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). The Commissioner may

reject any medical opinion if the evidence supports a contrary finding.  *Sryock v. Heckler*, 764 F.

2d 834, 835 (11th Cir. 1985).

In his decision, the ALJ in this case recounted the consultative psychologist Dr. Nichols's

opinion in detail, noting that she found that the claimant is "severely compromised" in her ability

23

to "relate interpersonally and withstand the pressures of everyday work." (R. 34).   The ALJ articulated that he also considered Dr. Nichols's findings that the claimant could remember, understand, and carry out simple work-related instructions.  The ALJ also noted Dr. Nichols's assessment of a GAF score of 55, "indicative of only moderate difficulties in social and occupational functioning."  (R. 34, 39).

The ALJ indicated that he gave great weight to and considered all of  Dr. Nichols's findings regarding these limitations in making his decision.  The ALJ's consideration of Dr. Nichols's entire opinion is evidenced by the ALJ's inclusions of Dr. Nichol's limitations in the RFC finding that the claimant could perform sedentary work with certain limitations.  In his RFC, the ALJ specifically limited the claimant to performing simple, repetitive, non-complex tasks and working with things and not people, in accordance with Dr. Nichols's assessment. Even though Dr. Nichols indicated "severe" limitations in her ability to relate interpersonally with others, the ALJ properly took this limitation into account in the RFC determination.

Moreover, the ALJ noted Dr. Rogue's conflicting mental assessment that assessed the claimant as having *moderate* limitations in her ability to maintain social functioning and perform work-related tasks.  The ALJ took both Dr. Nichols and Dr. Rogue's findings into consideration in making his determinations and had the right to discount any part of Dr. Nichols's opinion that he found conflicted with the medical record as a whole.

This court finds that the ALJ applied the proper legal standards in evaluating Dr. Nichols's mental assessment of the claimant and that substantial evidence supports his findings.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the ALJ applied the proper legal standards and that substantial evidence supports his decision.  Therefore, this court finds that the decision of the Commissioner is due to be AFFIRMED.

The court will enter a separate Order in accordance with this Memorandum Opinion.

DONE and ORDERED this 30th day of September, 2013.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

25